**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSEPH GREENE, on behalf of himself and all others similarly situated, | Case No. 25-9058 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| HEALTHFIRST PHSP, INC., | |
| Defendant. | |

Plaintiff Joseph Greene brings this class action for damages, equitable relief, and injunctive relief against Healthfirst PHSP, Inc. ("Healthfirst" or "Defendant"). Plaintiff alleges the following based upon personal information as to allegations regarding himself, his own investigation, and the investigation of his counsel, and on information and belief as to all other allegations.

## INTRODUCTION

1. There is a mental health crisis in this country and in this state. It is afflicting men and women, children and adults, and people of all income levels and backgrounds. And it is exacerbated by companies, like Defendant, that mislead vulnerable individuals in need of qualified mental health providers by publishing grossly inaccurate directories of doctors and therapists. These inaccurate directories are known as "ghost networks."

2. Ghost networks are directories of supposedly available, in-network providers that contain so many incorrect or duplicative entries that the network is largely illusory. Mental health provider directories are more likely than any other medical specialty to be ghost networks.

3. When there are very few—or no—accessible, available doctors in Defendant's network, the network does not comply with state and federal network adequacy laws. Such grossly inaccurate listings in a directory also violate the No Surprises Act, the Mental Health

Parity and Addiction Equity Act, Defendant's contractual obligations to Plaintiff, and New York's consumer protection laws (General Business Law §§ 349 and 350), New York Insurance Law § 4226, and the New York State Department of Financial Services' standards.

4.      Defendant engages in deceptive business practices by knowingly publishing an inaccurate and misleading provider directory. It does so for several reasons: 1) a robust provider network is attractive to potential customers; 2) a seemingly robust directory of providers gives Defendant the appearance of compliance with state and federal network adequacy laws (without the costs associated with creating and maintaining an adequate network and accurate directory); and 3) when members forego care after a time-consuming and frustrating provider search, Defendant does not have to pay for the care they would have received.

5.      By publishing a provider directory in which the vast majority of doctors do not exist, cannot be contacted through the information provided, are not actually in-network with Defendant, and/or are not accepting new patients, Defendant actively harms its members. When Defendant misrepresents its network, members like Plaintiff pay inflated premiums for an insurance plan that does not actually offer an adequate provider network to meet their needs. Many members, like Plaintiff, have no choice but to utilize out-of-network doctors, incurring thousands of dollars in expenses.

6.      Plaintiff's insurance policies claim to cover mental health care with a robust network of available mental health providers made available by Defendant. In reality, that network is threadbare: there are very few mental health providers in New York who actually take the insurance, are in-network, and accept new patients. Thus, the promised coverage is largely non-existent.

7.     These harms are not just financial. They also exacerbate members' mental health problems. The people using Defendant's provider directory are often desperate for mental health care for themselves or their loved ones. Members searching for care often spend countless hours calling providers that Defendant has represented as available, accessible, and in-network, only to find out that the providers do not participate in Defendant's network, do not offer the services listed in Defendant's provider directory, are not qualified to provide those services, or cannot be reached at the phone number listed by Defendant.

8.     Some members, like Plaintiff, are forced to delay treatment while struggling to find a provider. Others abandon their search for care, resulting in serious, potentially life-threatening consequences. Thus, the coverage promised by Defendant is largely illusory.

**JURISDICTION AND VENUE**

9.     Federal law provides an essential element of Plaintiff's claims. Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendant transacts substantial business in this Judicial District.

**THE PARTIES**

**I.     Plaintiff**

11.     Plaintiff Joseph Greene is a resident of Bronx County, New York. He was enrolled in the Healthfirst Gold Leaf Premier plan from January 2023 to March 2024 and the Healthfirst Essential Plan 200-250 from April 2024 to August 2025. He has been enrolled in the Healthfirst Essential Plan 1 from September 2025 to the present.

II.    **Defendant**

12.    Defendant Healthfirst PHSP, Inc. ("Healthfirst") is a not-for-profit corporation registered to do business in New York. It administers the Healthfirst Essential Plans and the Healthfirst Gold Leaf Plans ("the Plans").

## BACKGROUND & CONTEXT

I.    **The Mental Health Crisis in America**

13.    There is a mental health crisis in the United States. According to the National Institute of Mental Health, an estimated 59.3 million adults in the U.S.—approximately 23.1% of adults—struggle with mental illness.[1] Mental health problems are even more prevalent in younger adults, with 36.2% of adults ages 18–25 and 29.4% of adults ages 26–49 reportedly having a mental illness. Despite this prevalence, roughly half (49.4%) of the 59.3 million adults living with mental illness have not received mental health treatment within the last year.[2]

14.    In 2022, an estimated 15.4 million adults in the U.S. (6% of the adult population) had a *serious* mental illness, defined as "a mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities."[3] Despite the potentially disabling or even life-threatening effects of forgoing treatment, one third of those with serious mental illness do not receive treatment.[4]

15.    According to the Centers for Disease Control and Prevention ("CDC"), among adolescents aged 12 to 17 years old, 20.9% have had a major depressive episode; among high

---

[1] National Institute of Mental Health, *Mental Illness Statistics*, https://www.nimh.nih.gov/health/statistics/mental-illness.

[2] *Id.*

[3] *Id.*

[4] *Id.*

school students, 36.7% have had persistent feelings of sadness or hopelessness, and 18.8% have attempted suicide.[5]

16.     With the rates of pediatric self-harm and suicide rising dramatically,[6] the Surgeon General of the United States has described mental health as "the defining public health crisis of our time,"[7] and urged that "every child ha[ve] access to high-quality, affordable, and culturally competent mental health care."[8]

17.     Despite the "profound" consequences of untreated mental illness in children and adolescents, which are associated with "school failure, teenage pregnancy, unstable employment, substance use, violence including suicide and homicide, and poor medical outcomes,"[9] the CDC estimates that only approximately 20 percent of children with a mental, emotional, or behavioral disorder receive care from a specialized mental health provider.[10]

---

[5] Rebecca H. Bitsko *et. al.*, *Mental Health Surveillance Among Children – United States, 2013–2019*, Ctrs. for Disease Control and Prevention (2022), https://www.cdc.gov/mmwr/volumes/71/su/su7102a1.htm.

[6] Bommersbach et al., *National Trends in Mental Health-Related Emergency Department Visits Among Youth, 2011-2020*, J. of the Am. Med. Ass'n (May 2, 2023), https://pubmed.ncbi.nlm.nih.gov/37129655/ (finding a 57 percent increase in suicide among young Americans from 2009 to 2019, and a staggering 329 percent increase in pediatric self-harm visits from 2007 to 2016).

[7] Matt Richtel, *The Surgeon General's New Mission: Adolescent Mental Health*, N.Y. TIMES, (Mar. 21, 2023), https://www.nytimes.com/2023/03/21/health/surgeon-general-adolescents-mental-health.html.

[8] *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory*, Off. of the Surgeon Gen. at 12 (2021), https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf.

[9] School-Based Mental Health: Pediatric Mental Health Minute Series, Am. Academy of Pediatrics, https://www.aap.org/en/patient-care/mental-health-minute/school-based-mental-health/.

[10] Ctrs. for Disease Control and Prevention, *Improving Access to Children's Mental Health Care*, https://archive.cdc.gov/#/details?q=mproving%20Access%20to%20Care,%20Children%E2%80%99s%20Mental%20Health%22&start=0&rows=10&url=https://www.cdc.gov/childrensmentalhealth/access.html.

II.    **Federal and State Requirements for Health Insurers**

A.    **Insurers Must Ensure Accuracy of Provider Directories**

18.    As awareness of the prevalence of ghost networks grows, federal and state laws and regulations have been promulgated to protect consumers from the harms of ghost networks.

19.    The No Surprises Act, which became effective in 2022, requires insurers to update and verify their plans' provider directories at least every 90 days.[11] Where plans are unable to verify provider data, they must establish a procedure to remove providers from their directories.[12] Health plans must also update provider information within two business days of receiving an update from a provider.[13] When a member telephonically requests information about whether a provider is in-network, the plan must respond within one business day of the request.[14]

20.    In New York, state law requires insurers to take more rigorous steps to ensure that their provider directories are accurate. Health insurers are required to update their provider directories within 15 days of the "addition or termination of a provider from the insurer's network or a change in a physician's hospital affiliation"—and otherwise update their plans' directories annually.[15] Managed care organizations are required to make these updates quarterly and to notify members of updates annually.[16] State law also requires health plans to include in

---

[11] 42 U.S.C. § 300gg-115(a)(2).

[12] *Id.*

[13] *Id.*

[14] 42 U.S.C. § 300gg-115(a)(3).

[15] N.Y. Ins. Law §§ 3217-a(a)(17); 4324(a)(17); N.Y. Pub. Health Law § 4408(1)(r) .

[16] 10 N.Y.C.R.R. 98-1(16)(i).

their directories whether a provider is accepting new patients and any restrictions on the availability of a provider's services.[17]

21.    Furthermore, Section 4226 of the New York State Insurance Law prohibits insurers from issuing or circulating "any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."[18] When an insurer is found to have made such a misrepresentation, "it shall not be presumed that the insured knew or knows of any of the provisions or benefits contained in any insurance policy or contract."[19] Health maintenance organizations must also ensure that "all information disseminated to the public . . . be strictly factual in nature and accurate in all respects and shall not in any way be misleading to the public."[20]

22.    Under New York law, when a health plan member receives a bill for out-of-network services after relying on the insurer's representation that the provider was in-network, the insurance plan is required to pay for the services and cannot charge the member more than their in-network cost sharing obligation regardless of whether the plan covers out-of-network services.[21]

23.    These federal and state laws reflect that governments recognize the harmful consequences of inaccurate provider directories. Despite these legislative efforts to shield consumers from ghost networks, surprise bills, and inadequate in-network care, Defendant continues to violate these laws.

---

[17] *Id.*

[18] N.Y. Ins. Law § 4226(a)(1).

[19] N.Y. Ins. Law § 4226(c).

[20] N.Y. Pub. Health Law § 4405(10).

[21] N.Y. Ins. Law §§ 3217-b(n); 4325(o).

**B.    Insurers Must Have an Adequate Network of Providers**

24.    Federal and state laws also require health plans to offer a network that includes an adequate number of in-network providers to meet members' needs.

25.    The Affordable Care Act first established this network adequacy framework, requiring that all qualified health plans ensure the provision of a network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[22]

26.    In addition, the Mental Health Parity and Addiction Equity Act ("MHPAEA"), 42 U.S.C. § 300gg-26, incorporated into the Affordable Care Act via 45 C.F.R. 156.115, provides that mental health and substance use disorder benefits must not be provided on less favorable terms than medical and surgical benefits, specifically with respect to annual, aggregate, or lifetime limits on coverage, financial requirements, treatment limitations, and out-of-network coverage.[23]

27.    MHPAEA regulations provide that "all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility-type limits, and network adequacy."[24]

28.    New York law also requires health insurers to "ensure that the network is adequate to meet the health and mental health needs of insureds and provide an appropriate choice of

---

[22] 45 C.F.R. § 156.230(a)(1)(ii).

[23] 29 U.S.C. §1185a(a); 42 U.S.C. § 300gg-26(a).

[24] Ctrs. for Medicare & Medicaid Services, *The Mental Health Parity and Addiction Equity Act* (2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-addiction-equity; *see also* 29 C.F.R. 2590.712(c)(4).

providers sufficient to render the services covered under the policy or contract."[25] The New York Department of Financial Services advises that mental health providers should be accessible within 30 minutes by public transportation in metropolitan areas and/or 30 minutes or 30 miles by public transportation or by car in non-metropolitan areas.[26] When a member is unable to access an appropriate provider through the network, the insurer is required to provide a referral to an out-of-network provider at the in-network cost-sharing amount.[27]

29.    By inflating their provider directories with inaccurate listings, insurers appear to meet federal and state network adequacy requirements when in reality they do not.[28]

30.    Defendant is in violation of federal and state law requiring network adequacy.

## III.    Ghost Networks

31.    The prevalence and harms of mental health ghost networks have been widely investigated and confirmed by countless studies and reports, including by *The New York Times*,[29]

---

[25] N.Y. Ins. Law § 3241(a)(1).

[26] *See Network Adequacy Submission Instructions and Standards*, N.Y. State Dep't of Fin. Servs. (September 9, 2025), https://www.dfs.ny.gov/apps_and_licensing/health_insurers/network_adequacy_reqs_standards_submission_instructions.

[27] N.Y. Ins. Law § 4804(a).

[28] *Barriers to Mental Health Care: Improving Provider Directory Accuracy to Reduce the Prevalence of Ghost Networks*, U.S. Senate Fin. Comm. (May 3, 2023), https://www.finance.senate.gov/hearings/barriers-to-mental-health-care-improving-provider-directory-accuracy-to-reduce-the-prevalence-of-ghost-networks (hereinafter "Senate Hearings on Mental Health Care").

[29] Jay Hancock, *Insurers' Flawed Directories Leave Patients Scrambling for In-Network Doctors*, N.Y. TIMES (Dec. 3, 2016), https://www.nytimes.com/2016/12/03/us/inaccurate-doctor-directories-insurance-enrollment.html.

*The Washington Post*,[30] academics,[31] the American Medical Association,[32] the Government

Accountability Office,[33] and more.[34]

32.    As explained by a Yale Law & Policy Review article on ghost networks, the effects

of Defendant's ghost network are far-reaching and damage the very structure of our health care

system:

> Directory errors cost consumers money and erode regulatory consumer
> safeguards. They deceive consumers about the value of the coverage
> they are purchasing by concealing plans' actual provider networks,

---

[30] Katherine Ellison, *73 doctors and none available: How ghost networks hamper mental health care*, WASH. POST (Feb. 19, 2022), https://www.washingtonpost.com/health/2022/02/19/mental-health-ghost-network/.

[31] *See, e.g.*, Abigail Burman, *Laying Ghost Networks to Rest: Combatting Deceptive Health Plan Provider Directories*, 40 YALE L. & POL'Y REV. 78 (2021).

[32] *Improving Health Plan Provider Directories*, CAQH & AM. MED. ASS'N., 3, https://www.caqh.org/sites/default/files/other/CAQH-AMA_Improving%20Health%20Plan%20Provider%20Directories%20Whitepaper.pdf (finding that "more than half of patients use [the provider directory] to select a physician.") (hereinafter "Improving Health Plan Provider Directories").

[33] *Mental Health Care Access Challenges for Covered Consumers and Relevant Federal Efforts*, U.S. Gov't Accountability Office, Report to the Chairman, Comm. on Fin., U.S. Senate, 2, (Mar. 2022), https://www.gao.gov/assets/gao-22-104597.pdf.

[34] *See, e.g.*, Ellison, supra n.30; Jack Turban, *Ghost networks of psychiatrists make money for insurance companies but hinder patients' access to care*, Stat News (June 17, 2019), https://www.statnews.com/2019/06/17/ghost-networks-psychiatrists-hinder-patient-care/; *Online Provider Directory Review Report*, Ctrs. for Medicare & Medicaid Servs., 1, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/Provider_Directory_Review_Industry_Report_Round_3_11-28-2018.pdf; Cama et al., *Availability of Outpatient Mental Health Care by Pediatricians and Child Psychiatrists in Five U.S. Cities*, INT'L J. HEALTH SERV. 47(4) (2017), https://pubmed.ncbi.nlm.nih.gov/28474997/; Malowney et al., *Availability of Outpatient Care From Psychiatrists: A Simulated-Patient Study in Three U.S. Cities*, Psychiatry Online (2015), https://ps.psychiatryonline.org/doi/full/10.1176/appi.ps.201400051; Zhu et al., Phantom Networks: Discrepancies Between Reported And Realized Mental Health Care Access in Oregon Medicaid, Health Affairs 41(7) (2022), https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.00052; Susan H. Busch & Kelly A. Kyanko, *Incorrect Provider Directories Associated With Out-Of-Network Mental Health Care And Outpatient Surprise Bills*, Health Affairs 39(6) (2020), https://www.healthaffairs.org/doi/10.1377/hlthaff.2019.01501.

subjecting consumers to predatory billing practices, and breaking the link between consumer choices and plan practices that undergirds much of the American health insurance regulatory structure.[35]

A.    **The United States Senate Finance Committee Ghost Networks Hearings**

33.    A recent study of twelve major plan directories by the Senate Finance Committee majority revealed that over 80 percent of the listed in-network providers were in reality "either unreachable, not accepting new patients, or not in-network."[36] For Oregon, no successful appointments could be made.[37] On average, "[c]all times ranged from 1-3 hours to contact 10 listings per plan."[38]

34.    In May 2023, the United States Senate Finance Committee held a hearing on this exact topic. One testifying witness summarized her Sisyphean experience trying to find a mental health provider through her insurance plan's directory:

> Calling psychiatrists within D.C. and Maryland, selected out of what was like a digital white-pages phone book, turned into one rejection after another. . . . I spent countless days and hours scouring the network, despite working long hours in a high-level management position. When was there time to find a psychiatrist? I had to make the time, though, as my job, and more importantly my life, depended on it.[39]

35.    People seeking a mental health provider on a ghost network spend countless, difficult hours searching for care, which is extremely burdensome for a person who may be

---

[35] Burman, supra n. 31, at 85.

[36] *Majority Study Findings: Medicare Advantage Plan Directories Haunted by Ghost Networks*, Senate Comm. on Fin. at 1 (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/050323 Ghost Network Hearing - Secret Shopper Study Report.pdf.

[37] *Id.* at 7.

[38] *Id.* at 4.

[39] Senate Hearings on Mental Health Care (Statement of Keris Jän Myrick at 2–3), available at https://www.finance.senate.gov/imo/media/doc/barriers_to_mental_health_care_improving_provider_directory_accuracy_to_reduce_the_prevalence_of_ghost_networks.pdf.

experiencing a mental health emergency. As Dr. Robert Trestman, representing the American

Psychiatric Association, testified:

> For those who are healthy and well educated, going through an inaccurate provider list and being told repeatedly that "we are not taking new patients," "this provider has retired," "we no longer accept your insurance," or leaving a message with no one returning the call is at best frustrating. For people who are experiencing significant mental illness or substance use disorders, the process . . . is at best demoralizing and at worst set up to precipitate clinical deterioration and a preventable crisis. Many are already experiencing profound feelings of worthlessness, fear, grief from loss and trauma, and/or the impact of substance use; some are in crisis and suicidal. . . . Even when they make the effort to reach out to find help, something that can be very difficult anyway, their efforts to cull through an inaccurate provider list results in more rejection and failure, exacerbating these feelings. Some give up looking for care. Others delay care.[40]

36.    When people in need are unable to find an in-network mental health provider,

urgent mental health treatment is often delayed and, at worst, abandoned completely. Others

seeking care rely on the directory to find a provider, only to face significant, unexpected costs

when it becomes clear that the provider is not actually covered by their plan. And, in other cases,

people urgently seeking care knowingly settle for seeing an out-of-network provider at great

expense because they desperately need help and it is their only option.

37.    Though the effects of ghost networks are far-reaching and complex, the wrongful

conduct at issue is simple: insurance companies' ghost networks mislead consumers. As Senator

Ron Wyden stated in his opening remarks:

> [W]hen insurance companies host ghost networks, they are selling health coverage under false pretenses, because the mental health providers advertised in their plan directories aren't picking up the phone or taking new patients. In any other business, if a product or service doesn't meet expectations, consumers can ask for a refund. . . .

---

[40] *Id.* (Statement of Robert L. Trestman, PhD, MD at 2–3).

It's not hard to imagine how many Americans simply give up and go on struggling without the help they need. . ..

If a student were writing an essay and 80 percent of their citations were incorrect or made up, they'd receive an "F." If a business gave the SEC false or incorrect information, it would face extremely severe consequences. So in my view insurance companies should face strict consequences if their products don't live up to the billing.[41]

38.    When asked whether plans made their directories "inaccurate by design," testifying witness Mary Giliberti, the Chief Public Policy Officer of Mental Health America, responded:

MS. GILIBERTI: [A]bout 60 percent of the plans [being discussed] don't have out of network coverage, so if you get really frustrated and you pay on your own then they're not paying anything.

SENATOR WARREN: So the more the Medicare Advantage plan can frustrate you . . . the more you'll just go somewhere else. And that means it's not money out of their pockets. . . . So, look, what we are really saying here is that it is in the financial interests of these . . . plans to discourage beneficiaries from accessing care . . . . Because here's the key that underlines this. Whatever insurers don't spend on care as a result of tactics like outdated provider directories or overly restrictive networks or inaccurate information, whatever they don't spend on care, they get to keep.[42]

**B.    The New York Attorney General's Study**

39.    In December 2023, the New York State Office of the Attorney General ("OAG") issued its own report overviewing the inadequate provider directories of several health insurance companies operating in New York, including Defendant.[43]

---

[41] *Wyden Calls for Action to Get Rid of Ghost Networks, Releases Secret Shopper Study*, U.S. Senate Fin. Comm., Chairman Ron Wyden (May 3, 2023), https://www.finance.senate.gov/imo/media/doc/Wyden%20Ghost%20Networks%20Hearing%20Remarks%205.3.23.pdf.

[42] Senate Hearings on Mental Health Care (Testimony of Senator Elizabeth Warren).

[43] Office of the New York State Attorney General Letitia James, *Inaccurate and Inadequate: Health Plans' Mental Health Provider Network Directories* (2023), https://ag.ny.gov/sites/default/files/reports/mental-health-report_0.pdf (hereinafter "NYS OAG Report").

40.    The OAG conducted a secret shopper survey of 13 health insurers, including

Defendant, and "nearly 400 mental health providers listed on health plans' networks." The

survey "found that the overwhelming majority, 86 percent, were 'ghosts,' meaning they were

unreachable, not-in-network, or not accepting new patients."[44]

41.    For Healthfirst specifically, the OAG tried to reach 20 mental health providers in

New York City listed by Healthfirst as in-network, but found that only seven actually were. And

of those, only one would offer any type of appointment, with no provider offering an in-person

appointment. The OAG calculated the Healthfirst ghost listing percentage at 95 percent.[45]

42.    The OAG's findings were even worse when looking specifically for providers who

treat children. Of the seven children's mental health providers that the OAG attempted to

contact, four were actually in-network, but none actually treat children despite being listed in the

Healthfirst directory as doing so. The OAG's search found no in-network providers offering

appointments for children.[46]

43.    Of all the purportedly in-network providers that the OAG attempted to contact,

40% were impossible to reach due to incorrect or non-working phone numbers provided by

Healthfirst or unreturned calls. Another 15% were not actually practicing at the office for which

Healthfirst had provided contact information. A further 35% of providers were not actually in-

---

[44] Press Release, *Attorney General James Uncovers Major Problems Accessing Mental Health Care through Insurance Companies* (Dec. 7, 2023), https://ag.ny.gov/press-release/2023/attorney-general-james-uncovers-major-problems-accessing-mental-health-care.

[45] NYS OAG Report at 28.

[46] *Id.*

network, did not actually provide the services that were listed in the directory, or required a referral from within their practice before they would take on a new patient.[47]

## FACTUAL ALLEGATIONS

### I.    Plaintiff's Needs for Mental Health Care

44.    Plaintiff Joseph Greene is a resident of Bronx County, New York.

45.    Mr. Greene has been enrolled in health insurance through Healthfirst since January 2023. From January 1, 2023 to March 31 2024, he was enrolled in the Healthfirst Gold Leaf Premier plan (the "Gold Leaf" plan). From April 1, 2024 through August 31, 2025, he was enrolled in the Healthfirst Essential Plan 200-250. He has been enrolled in the Healthfirst Essential Plan 1 since September 1, 2025.

46.    When deciding to enroll himself and his family in coverage through Healthfirst, Mr. Greene specifically relied on Healthfirst's representations that their plan provided coverage for in-network mental health care.

47.    Mr. Greene's former provider retired in 2022, so Mr. Greene began searching for a psychiatrist in the Healthfirst provider directory immediately after enrolling in coverage through Healthfirst in January 2023.

48.    Mr. Greene, who relies on medication that must be prescribed by a psychiatrist or nurse practitioner, urgently needed to find a new provider to be able to continue receiving his medication. But when he began calling providers from the Healthfirst directory, he was unable to find a provider who was in-network and accepting new patients. At best, he was offered an appointment six to eight months out, which would force him to go without his medication in the meantime.

---

[47] *Id.*

49.    After reaching out to approximately 35 providers, Mr. Greene was unable to find an in-network psychiatrist offering appointments in the near future.

50.    After being unable to locate an available provider through the directory, Mr. Greene called Healthfirst to inform them of his difficulty locating an available in-network provider. Healthfirst initially referred Mr. Greene back to the directory as the resource for locating available, in-network care. When Mr. Greene told Healthfirst that he could not find a provider in the directory who was available to book an appointment, Healthfirst told him that its obligation was to supply a list of providers who *could* prescribe his medication, not necessarily providers who *would* prescribe it. He received no follow-up communication from Healthfirst regarding his inability to find care.

51.    Mr. Greene then sought advice from his primary care provider, who suggested that he reach out to providers within the Montefiore system, which is in-network with Healthfirst. Mr. Greene contacted more than ten Montefiore providers, most of whom did not return his calls. The providers who did respond told him they had no availability for six to ten months.

52.    In November 2023, unable to go without care any longer, Mr. Greene began seeing an out-of-network psychiatrist. Because his Healthfirst plan does not provide any coverage for out-of-network care, Mr. Greene has incurred significant costs for this care. Over the past three years, Mr. Greene has spent $175 per month on monthly sessions with his psychiatrist. If this same care were covered by Healthfirst, the monthly cost would be $20.

53.    Plaintiff relied on Defendant's marketing materials, website, provider directory, and plan documents when deciding to enroll in Defendant's plan and, once enrolled, to understand his benefits.

54. When deciding to enroll in coverage through Healthfirst, Plaintiff relied on implicit and explicit representations by Defendant that the provider directory was robust and accurate, especially with respect to mental health providers.

55. Over the same time period during which Defendant failed to supply in-network mental health providers within a reasonable distance of Plaintiff's residence, Plaintiff identified and received treatment from in-network providers within a reasonable distance for primary care, neurology, gastroenterology, urology, rheumatology, cardiology, and pulmonology.

56. On information and belief, over the same period, other members of the class were able to identify in-network providers within a reasonable distance for analogous medical and surgical services, including physical therapy, orthopedics, pain management, psychiatry, neurology, cardiology, podiatry, dermatology, rheumatology, gastroenterology, oncology, immunology, anesthesiology, and internal medicine and Defendant approved claims for these services.

## II.    Defendant's Ghost Network

### A.    Defendant's Plans and Mental Health Coverage

57. New York State contracts with Healthfirst to provide health insurance benefits, including mental health benefits, to people eligible to enroll in Qualified Health Plans and Essential Plans through the New York State of Health marketplace.

58. Separately, Healthfirst contracts directly with individual enrollees in its Qualified Health Plans and Essential Plans. Across the Qualified Health Plans and Essential Plans, these direct contracts contain the following provisions:

    a) Healthfirst agrees to provide coverage for "outpatient mental health care services, including but not limited to partial hospitalization program services and intensive outpatient program services, relating to the diagnosis and treatment of mental

health conditions." This coverage includes "services provided by a licensed psychiatrist or psychologist; a licensed clinical social worker; a licensed nurse practitioner; a licensed mental health counsel; a licensed marriage and family therapist; a licensed psychoanalyst; or a professional corporation or a university faculty practice corporation thereof."

b)  The contract directs members to the Healthfirst website, among other options, to locate an in-network provider and guarantees that "The Provider directory will give You the following information about Our Participating Providers: Name, address, and telephone number; Specialty; Board certification (if applicable); Languages spoken; Whether the Participating Provider is accepting new patients."

c)  When a member "request[s] an appointment for outpatient mental health care or outpatient substance use services, a Participating Provider must offer You an appointment within . . . Ten (10) business days for an initial appointment."

d)  Healthfirst agrees to have "designated staff to assist You in finding a Participating Provider who can treat Your mental health condition or substance use disorder. You may contact Our designated staff by calling the number available on Our website."

e)  When a member is unable to find an in-network provider and contacts Healthfirst by phone to submit an Access Complaint, Healthfirst is required within three days to locate a provider who is available within a reasonable distance and time to treat the member's mental health condition. If Healthfirst is unable to locate a provider within three days, it must notify the member of their right to receive a referral to an out-of-network provider. Services provided by this out-of-network provider

must be covered by Healthfirst "as if they were provided by a Participating

Provider."

**Gold Leaf Premier Plan**

59.    Healthfirst's Gold Leaf Premier Plan is a Qualified Health Plan offered on the New

York State of Health marketplace. In New York, Gold-tier marketplace plans feature higher

monthly premiums but lower deductibles and copays, making them suitable for consumers who

frequently require medical care.[48]

60.    Enrollees in the Gold Leaf Premier Plan pay a monthly premium, which income-

eligible enrollees can offset using premium tax credits.

61.    While enrolled in the Gold Leaf Premier Plan, Mr. Greene paid a monthly premium

of $957.39 in 2023 and $1,302.49 in 2024 after applicable premium tax credits for coverage for

himself, his wife, and their two children.

62.    Since at least 2023, outpatient mental health services have been subject to a $20

copay when provided by an in-network provider. The Gold Leaf Premier Plan offers no coverage

for mental health services from out-of-network providers.

63.    According to the Plan's Summary of Benefits and Coverage, preauthorization is

required for "Select Services" within the mental health category before coverage is available.

64.    For in-network care, out-of-pocket costs are capped at $12,500 for a family for the

year. There is no cap for out-of-network spending.

---

[48] VistaHealth, Qualified Health Plans: NY State of Health,
https://www.nyhealthinsurer.com/qualified-health-plans/, last accessed Oct. 21, 2025.

**Essential 200-250 Plan**

65.    Healthfirst's Essential 200-250 Plan is available to New Yorkers with a household income between 200% and 250% of the federal poverty level.

66.    Enrollees in the Essential 200-250 Plan pay no premium, but the State of New York subsidizes their enrollment by paying a capitated rate to Healthfirst for each New Yorker that enrolls in the Plan.[49]

67.    Outpatient mental health services are subject to a $15 copay when provided by an in-network provider. The Essential 200-250 Plan offers no coverage for mental health services from out-of-network providers.

68.    For in-network care, out-of-pocket costs are capped at $2,000 for the year. There is no cap for out-of-network spending.

69.    According to the Plan's Summary of Benefits and Coverage, preauthorization is required for "Select Services" within the mental health category before coverage is available.

**Essential Plan 1**

70.    Healthfirst's Essential Plan 1 is available to New Yorkers with a household income between 150% and 200% of the federal poverty level.

71.    The Essential Plan 1 has no premium and no deductible. As with the Essential 200-250 Plan, Healthfirst receives a capitated rate payment from New York State for each enrollee.

---

[49] NY State of Health, Invitation and Requirements for Insurer Certification and Recertification for Participation in 2026, at 36, https://info.nystateofhealth.ny.gov/sites/default/files/NY%20State%20of%20Health%20Plan%20Invitation%202026%20Revised%2005-08-25.pdf ("EP Applicants who contract with the DOH to offer the Essential Plan on the NY State of Health Marketplace will receive from DOH, a monthly capitation payment for each member that has enrolled in its EP.").

72.     The plan requires a $15 co-pay for in-network outpatient mental health services and provides no coverage for out-of-network outpatient mental health services.

73.     According to the Plan's Summary of Benefits and Coverage, preauthorization is required for "Select Services" within the mental health category before coverage is available.

74.     For in-network care, out-of-pocket costs are capped at $360 for the year. There is no cap for out-of-network spending.

**B.      Defendant's Provider Directory**

75.     At all relevant times, Defendant published an online directory of mental health providers who are supposedly in-network with Defendant, available to see new patients, and qualified to provide specified mental health services. This directory is the definitive resource to identify which providers are in Defendant's network and are thereby covered as at the plan's in-network rate. This directory is publicly available to members and non-members of the Healthfirst's plans.[50]

76.     The Healthfirst Essential Plan Handbook directs members to HFDocFinder.org— which redirects to the Healthfirst provider directory— to "find participating doctors." The Handbook also notes that the Essential Plans do not cover out-of-network care, so members should "make sure your provider is in the Healthfirst network" by visiting HFDocFinder.org.

77.     This directory can be sorted and searched based on the following criteria: gender, age-treated, accepting new patients, language spoken, location, office hours, hospital affiliation, focus area, virtual visits, and more.

78.     Defendant's provider directory affirmatively misrepresents to current and prospective members that the mental health providers listed are in fact in-network and will be

---

[50] Healthfirst, Find a Doctor, https://healthfirst.org/find-a-doctor, last accessed Oct. 28, 2025.

accessible and available to provide care. Instead, the vast majority of providers listed in the directory are not in-network, not available, not reachable, not qualified to provide the services listed for them, or not actually practicing at the listed location.

79.    Moreover, Defendant's provider directory is replete with inaccuracies of all kinds, including incorrect addresses and phone numbers, as well as repeated entries of the same provider. These inaccuracies may appear at first glance to be a minor oversight, but such errors are far from trivial for a person who needs mental health care for themself or a loved one. The inclusion of incorrect telephone numbers artificially inflates the perceived size and adequacy of Defendant's network and forces members to invest more time and energy trying to find a mental health provider—only to be repeatedly led to a dead end.

80.    These inaccuracies make it appear that Defendant contracts with vastly more mental health providers than it does. Accordingly, Defendant's provider directory, and representations about its comprehensive mental health coverage, are inaccurate, deceptive, and misleading.

## III.    Defendant's Deceptive and Misleading Activity

### A.    Defendant's Misrepresentations and Omissions

81.    Defendant holds itself out to consumers—through the provider directory and marketing material—as having a robust network of providers to meet members' mental health care needs. These representations are deceptive, as the directory misrepresents the breadth of the network and the ease of utilizing the benefits available under the insurance plan.

82.    In addition to publishing and maintaining an inaccurate provider directory, Defendant provides consumers with deceptive and materially misleading marketing and program materials about the benefits offered under its plan. These materials promise mental health benefits and a robust network of providers.

83.     On its "About Us" page, Healthfirst boasts a network of more than 40,000 providers. This representation is grossly misleading because an estimated 95 percent of those listings are "ghosts." Defendant's network is far smaller than advertised.

84.     On its Frequently Asked Questions page, Healthfirst claims to have "a large network that includes thousands of doctors and specialists." In answering the question "Why should I choose Healthfirst?" Defendant states that "With access to thousands of doctors and specialists, *you're sure to find the service you need nearby*."

85.     Healthfirst regularly emails prospective members to advertise its plans. In one recent email with the subject line "Explore our large provider network," Healthfirst states that "As a Healthfirst member, you'll have access to a large network of primary care providers (PCPs) and specialists—with low or no copays. With so many doctors to choose from, *it's easy to get the care you need from an experienced provider*." The email includes a link to the provider directory with the text "Explore our network today."

86.     These statements are misrepresentations and misleading because consumers like Plaintiff spend a great deal of time searching for in-network providers of mental health care, often to no avail. Consumers often have to seek help out of network because Defendant's network lacks adequate providers.

87.     On a page discussing Healthfirst's "Plan Benefits and Features," Healthfirst claims to have a "large network of doctors" and "Member services who will help you get the care and support you need."

88.     This statement is inaccurate and misleading because Defendant does not have a large provider network on which consumers can rely. Its directory is intentionally and grossly

inaccurate, and consumers are often left struggling and wasting time searching for treatment long after they start to seek out a mental health professional.

89.    Defendant misleads consumers by making them believe that they will have access to a sufficiently broad network of providers to meet their care needs and make use of the coverage provided by Defendant, when, in reality, Defendant's directories are inaccurate and its network is sparse.

90.    When Plaintiff contacted Defendant directly by phone, he was told by Healthfirst representatives that he could and should use the online provider directory to locate available, in-network providers. Defendant also told Plaintiff that it had no responsibility to ensure that he was able to locate timely care so long as it directed him to the list of providers.

91.    Consumers rely on an insurer's directory to find providers in their health plan. As stated by the American Medical Association and the Council for Affordable Quality Healthcare:

> Health plans are expected by their members and their contracted practices to display a provider directory to the public that represents an accurate reflection of their networks. It is the most public-facing data that health plans provide, and patients are dependent on accurate directories to access care.[51]

92.    On its website, Healthfirst repeatedly directs consumers to its provider directory to find in-network care. On its FAQ page, it states that members should "visit HFDocFinder to find an in-network Healthfirst provider."[52] Defendant's repeated focus on the importance of using an in-network provider, and repeated direction of members to use the provider directory to find an in-network provider, implies that members can rely on the directory to accurately reflect the pool of available, in-network providers.

---

[51] Improving Health Plan Provider Directories at 7.

[52] The HFDocFinder text links to the provider directory, available at healthfirst.org/find-a-doctor.

93.    In truth, its directory reflects a 95% ghost rate.

94.    Any argument by Defendant that the members should have themselves verified that the providers were in fact in-network does not absolve Defendant of its obligation to accurately represent the mental health providers available in its network.

95.    Any boilerplate disclaimers Defendant might provide would be woefully insufficient. Put another way, no reasonable consumer viewing a boilerplate disclaimer would understand that up to 95% of mental health providers listed in Defendant's directory are not available to treat members of Defendant's plan. Indeed, there is no disclaimer broad enough to absolve that level of deception.

96.    In the Summary of Benefits and Coverage for each of its plans, Defendant represents that the plan provides Minimum Essential Coverage and meets the Minimum Value Standards for coverage required by the Affordable Care Act.

97.    Separately and together, Defendant's representations mislead consumers to believe that members will have access to a network of providers that is robust enough to allow them to utilize their comprehensive coverage with Defendant, and that they only need to look to and rely on the provider network to find necessary mental health care. In reality, Defendant's failure to maintain an accurate directory makes it nearly impossible to obtain in-network mental health care.

98.    The incorporation of the inaccurate directory into the plans' marketing materials through references to providers, services, and network on Defendant's public website constituted a knowing false statement and representation of fact in connection with the marketing and sale of the plan.

99.    In addition to the affirmative misrepresentations made by Defendant about the breadth of its provider network and comprehensiveness of Defendant's mental health care coverage, Defendant also makes material omissions, including but not limited to its failure to disclose:

a)  the inadequacy of Defendant's network to meet members' care needs;

b)  the extent of provider directory inaccuracies;

c)  that the vast majority of in-network mental health providers are not accessible;

d)  the likelihood that members will be unable to find an in-network mental health provider through the directory;

e)  the likelihood that members will need to delay or forgo coverage, or resort to using an out-of-network provider; and

f)  the likelihood that members will be unable to use the coverage that their plan provides for in-network mental health care.

100.   There is complete information asymmetry between Defendant and consumers: Defendant has an obligation under the law to access all the relevant information, including its own contracts with in-network providers, to determine whether providers are accurately listed, and to make regular updates to ensure accuracy. On the other hand, a member can only become aware of the extent of the directory inaccuracies after expending significant time and energy through trial and error, hours of calls, and extensive research. The information is not readily available to Plaintiff and other consumers.

### B.    Defendant's Misrepresentations and Omissions Are Material

101.   Plaintiff relied on Defendant's provider directory and representations regarding its provider network when choosing his health plan. Consumers in general regularly rely on a health

plan's provider directory to inform their choice of health plan.[53] Over half of consumers in one poll identified provider choice as the most important non-financial consideration they make when selecting a health plan.[54] In another survey, participants were willing to pay higher premiums for the ability to continue seeing their existing provider and for a plan with a wider network of providers in their area.[55] And, in a Kaiser Family Foundation survey, 60 percent of non-group health insurance enrollees reported that having a choice of providers was either "very important" or "extremely important" to them.[56]

102.   Given the importance of the provider network to prospective members, Defendant's misrepresentations and omissions in its directory would influence the decision of a reasonable consumer—and did influence Plaintiff's decision—to enroll in Defendant's plan. The provider directory and network information are disseminated by the insurance company, which Plaintiff and other consumers logically view as the authoritative source of information about its in-network providers, scope of coverage, and other plan policies.

103.   As a result of Defendant's misrepresentations and omissions, a reasonable consumer would understandably believe—and Plaintiff did believe—that each listing in the

---

[53] *See* Statista, *Most Important Considerations for Americans in Choosing a Plan from a Health Insurance Company as of 2016*, https://www.statista.com/statistics/654828/most-important-considerations-for-choosing-health-insurance-plan/.

[54] *See* Blumberg et al., *Factors Influencing Health Plan Choice among the Marketplace Target Population on the Eve of the Health Reform*, Urban Inst., 2 (Feb. 6, 2014), https://www.urban.org/sites/default/files/2024-05/hrms_decision_factors.pdf.

[55] Eline M. van den Broek-Altenburg & Adam J. Atherly, *Patient Preferences for Provider Choice: A Discrete Choice Experiment*, Am. J. of Managed Care 26(7) (July 2020), https://www.ajmc.com/view/patient-preferences-for-provider-choice-a-discrete-choice-experiment.

[56] Hamel et al., *Survey of Non-Group Health Insurance Enrollees, Wave 2*, Kaiser Family Foundation (May 2015), https://www.kff.org/health-reform/poll-finding/survey-of-non-group-health-insurance-enrollees-wave-2/ (finding a combined 60 percent of respondents consider choice of providers to be "extremely important" or "very important").

provider directory represented a health care professional who was in-network with Defendant and accepting new patients. If a reasonable consumer were aware of the extent of the inaccuracies of Defendant's directory, the sparse nature of Defendant's provider network, and the consequent difficulties that members face in accessing in-network care, they would not enroll in Defendant's plan. If Plaintiff had been so aware, he would not have enrolled in Defendant's plan.

104. Accordingly, Defendant's misrepresentations about its mental health provider network and coverage are materially misleading to consumers.

### C.    Members' Reliance on Defendant's Misrepresentations and Omissions

105. As a New York resident seeking coverage from the state health insurance marketplace, Plaintiff has a choice of health plans. For example, in 2025, the New York State of Health marketplace offered seven Essential Plans—income-gated plans that have no premium and no deductible—from a range of insurers that included Healthfirst, United Healthcare, Emblem, and Anthem BCBS. Each Essential Plan insurer receives a capitated rate from New York for every person who enrolls in coverage, so insurers are incentivized to attract as many new enrollees as possible even if the members themselves do not pay to enroll. The marketplace also offers a number of higher cost Qualified Health Plans from a range of insurers including Healthfirst.

106. Generally, consumers have the option to enroll in a Qualified Health Plan through the marketplace during the annual open enrollment period at the end of each year. Outside of this limited window, consumers cannot change plans unless they experience a Qualifying Life Event, such as a marriage, birth of a child, or loss of health insurance. As a result, consumers are typically locked into their choice of health plan for a full year, even if they are not able to access care due to misrepresentations about the plan's coverage.

107.   When selecting a plan, Plaintiff relied on Defendant's representations that he and his family would have access to a large network of providers and would have access to low-cost mental health care through the provider network.

108.   Plaintiff selected the Gold Leaf Premier Plan specifically because he anticipated that he and his family would require frequent healthcare services—including mental health services—such that paying a higher premium for reduced care costs would be worthwhile.

109.   These misrepresentations about the size and breadth of the mental health provider network, the ease of finding mental health treatment by using the provider directory, the freedom to choose any listed in-network provider, the ability to control costs by seeing an in-network provider, and the comprehensive coverage of mental health care would induce a reasonable consumer—and did induce Plaintiff—to choose coverage through Healthfirst's Plans.

### D.    Defendant Knew That Its Provider Directory Was Inaccurate and That Its Representations Regarding Its Network Were Deceptive

110.   At all relevant times, Defendant has willfully and knowingly maintained an inaccurate and inflated provider directory to induce consumers to enroll in its coverage and to hide its non-compliance with network adequacy standards.

111.   As discussed above, there are numerous studies documenting the prevalence of ghost networks, especially for mental health providers, as well as recent congressional inquiries.

112.   As one state senator put it, insurance companies have "known about this for a long time and they haven't done anything about it. It's difficult not to assume that this kind of barrier is intentional."[57] Several insurance companies have been successfully sued over the issue.[58]

---

[57] Turban, *supra* n. 34.

[58] *See, e.g.*, *Anthem Resolves Calif. Provider Directory Error Case*, Bloomberg Law (Aug. 17, 2016), https://news.bloomberglaw.com/health-law-and-business/anthem-resolves-calif-provider-directory-error-case.

113.    The sheer magnitude of the inaccuracies in Defendant's directory—as many as 95 percent of the mental health providers listed—can only be the product of knowing misconduct or willful blindness, particularly in light of Defendant's legal obligation to update and maintain the directory.

114.    As demonstrated by the secret shopper study discussed above, Defendant published a false list of mental health providers in New York. Defendant falsely listed non-existent, unavailable, out-of-network, and irrelevant providers (*i.e.*, providers who do not provide the services specified in the directory).

115.    Defendant knew that members were having significant problems accessing in-network care. Members, including Plaintiff, have repeatedly contacted Defendant to report these difficulties.

116.    Defendant was incentivized to maintain, generate, and continue to publish an inaccurate directory to attract new enrollees, maintain current enrollees, and profit from enrollees' premiums while not actually providing the coverage that Defendant falsely represented that it provided.

117.    On information and belief, at all relevant times, Defendant fraudulently and intentionally maintained and published materially false directories of mental health providers in New York to deceive current and prospective enrollees about the extent of their provider network. These intentional and fraudulent misrepresentations were made for the enrichment of Defendant.

IV.    **Defendant Has Been Enriched and Members Have Been Injured by Defendant's Misrepresentations and Omissions**

118.   Defendant's knowing misrepresentations about the breadth of its provider network confer significant financial benefits on Defendant and, conversely, deprive plan members of the benefit of their bargain.

119.   Prospective plan members are more likely to enroll if they see their existing provider listed as in-network or if the list of in-network providers is robust. Masking their inadequate network with an inaccurate provider directory therefore allows Defendant to attract more customers and charge higher premiums—all unjustly boosting Defendant's profits. Indeed, the more customers who enroll in its plan, and the more they pay in premiums, the more Defendant profits. Likewise, every time a member delays or forgoes care after failing to locate an available in-network provider, Defendant evades its obligation to pay for that member's care, reducing costs.[59] Defendant also reduces costs by not having to expend resources creating and maintaining a robust provider network and accurate provider directory.

120.   Plaintiff and others similarly situated have been grievously injured by Defendant's illegal conduct and the resulting inability to access necessary mental health treatment for themselves and their families.

121.   As a result of Defendant's illegal conduct, Plaintiff and other class members have suffered grievous injury, including facing significant, years-long delays in receiving critical mental health care; having to pay an inflated premium for a worthless product; having to pay exorbitant fees for out-of-network care for themselves and their dependents; and being unable to find appropriate treatment or, alarmingly, any treatment at all.

---

[59] *See* Alicia Atwood & Anthony T. Lo Sasso, *The Effect of Narrow Provider Networks on Health Care Use*, J. of Health Econ. (Dec. 2016), https://doi.org/10.1016/j.jhealeco.2016.09.007.

122.    Defendant's misrepresentations and omissions are the direct and proximate causes of the harms Plaintiff has endured. Had Defendant accurately represented its mental health care coverage, Plaintiff—and countless other consumers—would not have enrolled in coverage with this company. By enrolling in one of the other health insurance plans available to him, Plaintiff would have had access to the care he was promised and saved thousands of dollars in out-of-pocket expenses—not to mention the countless hours and emotional expense he would have been saved.

123.    Moreover, Defendant's misrepresentations artificially inflated the market price of its product, causing Plaintiff to pay more than he otherwise would have for premiums. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff suffered injury by paying insurance premiums but failing to receive commensurate benefits.

## CLASS ACTION ALLEGATIONS

124.    This action is brought by Plaintiff individually and on behalf of a class (the "Class") pursuant to Federal Rule of Civil Procedure 23. The Class includes all individuals who have purchased or enrolled in any of Healthfirst's Qualified Health Plans or Essential Plans—including the Gold Leaf Premier, Essential 200-250, and Essential 1 Plans—in New York at any point from 2019 through the date of class certification.

125.    Plaintiff seeks certification of the following Class:

> All persons who are currently, or were previously, enrolled in any of Healthfirst's Qualified Health Plans or Essential Plans—including the Gold Leaf Premier, Essential 200-250, and Essential 1 Plans—at any point from 2019 through the date of class certification.

126.    Excluded from the Class are Defendant's officers, directors, employees, co-conspirators, and legal representatives, and any judge, justice, or judicial officer to whom the litigation is assigned.

127.   Plaintiff reserves the right to amend or modify the Class definition.

128.   **Numerosity.** The Class consists of thousands of individuals, and is thus so numerous that joinder of all members is impracticable. The exact number and identity of Class members is unknown to Plaintiff at this time but can be ascertained through appropriate discovery.

129.   **Commonality and predominance.** This action is appropriate as a class action because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include, but are not limited to, the following:

a)      whether Defendant breached its contractual obligations by failing to provide the promised network of providers and/or by failing to comply with the ACA, the No Surprises Act, the MHPAEA, and/or other statutes, regulations, and rules with which Defendant is contractually obligated to comply;

b)      whether Defendant's representations and/or omissions with respect to the Gold Leaf Premier, Essential 200-250, and Essential 1 Plans were false or misleading under New York General Business Law ("GBL") §§ 349 and/or 350, New York Insurance Law § 4226(a) or equivalent, and/or common law;

c)      whether Defendant's violations of law were willful and knowing;

d)      whether Defendant's mental health provider directory was inaccurate and/or inadequate;

e)      whether Defendant failed to disclose to members and prospective members that the provider directory was inaccurate and/or inadequate;

f)      whether a reasonable consumer would be misled by Defendant's acts and practices;

g)      whether Plaintiff and Class members are entitled to receive specific types of relief such as actual damages, and the methodology for calculating those damages;

h)      whether Plaintiff and Class members conferred a benefit on Defendant through enrollment in the Gold Leaf Premier, Essential 200-250, and Essential 1 Plans, payment of premiums, directing state and federal premium payments to Defendant, and not utilizing in-network providers or otherwise not obtaining mental health care; and

i)      whether equity and good conscience require restitution to Plaintiff and Class members and/or the establishment of a constructive trust, and the amount of such restitution or constructive trust.

130.  **Typicality.** The claims asserted by Plaintiff are typical of the claims of the Class. At all relevant times, Defendant's provider directory was inadequate and inaccurate, and all Class members' claims arise out of this common source of misrepresentations and omissions. Plaintiff, like all Class members, was subject to deceptive and misleading representations and omissions found in Defendant's provider directory and other marketing and plan documents regarding the comprehensiveness of mental health coverage and the provider network. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class members, and Plaintiff and other Class members have been damaged by the same wrongdoing set forth in this Complaint.

131.  **Adequacy of representation.** Plaintiff will fairly and adequately protect the interests of the Class and does not have any interests antagonistic to those of the Class members. Plaintiff has retained counsel competent and experienced in class actions and health insurance and consumer protection litigation, who are competent to serve as Class counsel. Plaintiff and their counsel will fairly and adequately protect the interest of the Class members.

132. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)    given the complexity of issues involved in this action, the expense of litigating the claims, and the money at stake for any individual Class member, few, if any, Class members could afford to seek legal redress individually for the wrongs that Defendant has committed against them;

b)    the prosecution of thousands of separate actions by individual members would risk inconsistency in adjudication and outcomes that would establish incompatible standards of conduct for Defendant and burden the courts;

c)    when Defendant's liability has been adjudicated, claims of all Class members can be determined by the Court;

d)    this action will cause an orderly and expeditious administration of the Class claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

e)    without a class action, many Class members would continue to suffer injury while Defendant retains the substantial proceeds of its wrongful conduct; and

f)    this action does not present any undue difficulties that would impede its management by the Court as a class action.

133. **Ascertainability.** The identities and addresses of Class members can be readily ascertained from business records maintained by Defendant, and/or self-authentication. The precise number of class members, and their addresses, can be ascertained from Defendant's records. Plaintiff anticipates providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

134.   Plaintiff requests that the Court afford Class members with notice and the right to opt out of any Class certified in this action.

## FIRST CAUSE OF ACTION

### Breach of Contract

135.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

136.   A contract exists between New York State and Healthfirst to provide health insurance benefits, including mental health benefits, to people eligible to receive health insurance through New York's Essential Plans.

137.   A contract exists between New York State and Healthfirst to provide health insurance benefits, including mental health benefits, to New York residents who enroll in a Qualified Health Plan through the New York State of Health marketplace.

138.   Plaintiff, as a New York resident eligible to enroll in an Essential Plan and formerly enrolled in a Qualified Health Plan, is an intended third-party beneficiary of these contracts between the state and Defendant.

139.   Plan members, i.e. Plaintiff and the Class members, are mentioned throughout the contracts.

140.   The contracts between New York State and Healthfirst require Healthfirst to provide these insurance benefits in compliance with federal law.

141.   The contracts require Defendant to comply with the Affordable Care Act, Mental Health Parity and Addiction Equity Act, and No Surprises Act, among other federal laws, including sections 2799A–1, 2799A–2, 2799A–3, 2799A-4, 2799A-5, 2799A–7, and 2799A–8 of the Public Health Service Act; sections 716, 717, 718, 719, 720, 722, and 723 of the Employee

Retirement Income Security Act of 1974; and sections 9816, 9817, 9818, 9819, 9820, 9822, and 9823 of the Internal Revenue Code of 1986.

142.   The Affordable Care Act requires Defendant to maintain an adequate network that is "sufficient in number and types of providers, including providers that specialize in mental health and substance use disorder services, to ensure that all services will be accessible without unreasonable delay."[60]

143.   Defendant has breached the contracts by failing to contract with a sufficient number of mental health providers to allow members to access timely in-network mental health services.

144.   The Mental Health Parity and Addiction Equity Act, 42 U.S.C. § 300gg-26, incorporated into the Affordable Care Act via 45 C.F.R. 156.115, provides that mental health and substance use disorder benefits must not be provided on less favorable terms than medical and surgical benefits, specifically with respect to annual, aggregate, or lifetime limits on coverage, financial requirements, treatment limitations, and out-of-network coverage.[61] MHPAEA regulations provide that "all plan standards that limit the scope or duration of benefits for services are subject to the nonquantitative treatment limitation parity requirements. This includes restrictions such as geographic limits, facility-type limits, and network adequacy."[62]

145.   Defendant, in administering a marketplace plan that provides both medical and surgical benefits and mental health benefits, included financial requirements and treatment

---

[60] 45 C.F.R. § 156.230(a)(1)(ii).

[61] 29 U.S.C. §1185a(a); 42 U.S.C. § 300gg-26(a).

[62] Ctrs. for Medicare & Medicaid Services, *The Mental Health Parity and Addiction Equity Act* (2023), https://www.cms.gov/marketplace/private-health-insurance/mental-health-parity-addiction-equity; *see also* 29 C.F.R. 2590.712(c)(4).

limitations applicable to mental health benefits that were more restrictive than those applied to substantially all medical and surgical benefits covered by the plan.

146.   Among the many ways in which Defendant created a disparity in benefits, by falsely representing the scope of available in-network mental health providers, Defendant required Plaintiff and Class members to disproportionately seek treatment from out- of-network providers and pay higher costs than required of beneficiaries seeking medical and surgical benefits. This financial requirement was more restrictive for mental health benefits than for medical or surgical benefits. Defendant did not apply such treatment limitations to claims for medical and surgical benefits because in-network providers for medical and surgical treatments were more widely available under Defendant's health insurance.

147.   Sections 2799A-5 of the Public Health Service Act, 720 of the Employee Retirement Income Security Act of 1974, and 9820 of the Internal Revenue Code of 1986 require health insurers to verify and update their provider directories not less frequently than once every 90 days, remove a provider from the directory when they are unable to verify the directory information for that provider, and update the directory within two days of receiving new information from a provider.

148.   Defendant's failure to maintain an accurate directory of in-network providers violates the requirements in the Employee Retirement Income Security Act and Internal Revenue Code, and was thus a breach of the contracts between Defendant and New York State.

149.   Defendant has violated the above laws (and, by extension, its contractual obligations to Plaintiff and the Class) by, among other things, failing to ensure mental health network adequacy and failing to consistently provide an accurate network directory.

150.   Members of the Class (including Plaintiff) were damaged in several ways. The following is a non-exhaustive list of the types of damage incurred. First, they did not receive the benefits they were entitled to as members of the plan (most notably, access to the supposedly broad network of available providers), and for which they paid premiums. Second, they used out-of-network providers and paid those providers' out-of-network fees for care. Even after the plan reimbursed them the out-of-network allowed amount, these members typically incurred hundreds of dollars in out-of-pocket cost each time they received treatment – a cost far above their expected co-pay amount. Third, they abandoned their search for care, paying a premium for a service they were supposed to receive and did not, and incurring pain and suffering due to the unsuccessful provider search and their inability to receive treatment.

## SECOND CAUSE OF ACTION

### Breach of Contract

151.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

152.   Defendant and Plaintiff have a direct contractual relationship. The terms of that direct contractual relationship are governed by the Plan Contract provided by Defendant.

153.   In its contract with each enrollee, Defendant agrees to "[c]over outpatient mental health care services . . . relating to the diagnosis and treatment of mental health conditions." The contract goes on to state that "Coverage for outpatient services for mental health care includes . . . services provided by a licensed psychiatrist or psychologist; a licensed clinical social workers; a licensed nurse practitioner; a licensed mental health counsel; a licensed marriage and family therapist; a licensed psychoanalyst; or a professional corporation or a university faculty practice corporation thereof."

154.   The contract also provides that when a member "request[s] an appointment for outpatient mental health care or outpatient substance use services, a Participating Provider must offer You an appointment within . . . Ten (10) business days for an initial appointment."

155.   The contract also states that Healthfirst has "designated staff to assist You in finding a Participating Provider who can treat Your mental health condition or substance use disorder. You may contact Our designated staff by calling the number available on Our website."

156.   When a member is unable to find an in-network provider and contacts Healthfirst by phone to submit an Access Complaint, Healthfirst is required within three days to locate a provider who is available within a reasonable distance and time to treat the member's mental health condition. If Healthfirst is unable to locate a provider within three days, it must notify the member of their right to receive a referral to an out-of-network provider. Services provided by this out-of-network provider must be covered by Healthfirst "as if they were provided by a Participating Provider."

157.   Healthfirst breached its contract with Plaintiff by failing to provide meaningful coverage for outpatient mental health services. Because Healthfirst does not maintain an accurate provider directory, it has been impossible for Plaintiff to locate in-network care and therefore make use of the coverage supposedly provided.

158.   Healthfirst also breached its contract with Plaintiff by failing to adhere to the protocol established by the contract for resolving Access Complaints. After struggling to locate an in-network psychiatrist, Plaintiff contacted Healthfirst by phone to inform them of his inability to find care through the network. Rather than providing assistance in locating a provider, Healthfirst told Plaintiff that it was obligated only to direct him to in-network providers who could potentially prescribe his medication, not providers who were actually available to do

so. In other words, Healthfirst claimed that its only responsibility was to identify providers who were in its network. If those providers were not available to serve Plaintiff, Healthfirst would provide no further assistance.

159.   Plaintiff never received any follow-up communications from Healthfirst regarding his complaint. He did not receive any notice that he had the right to obtain a referral to an out-of-network provider whose services would be covered as if rendered by an in-network provider.

160.   Members of the Class (including Plaintiff) were damaged in several ways. The following is a non-exhaustive list of the types of damage incurred. First, they did not receive the benefits they were entitled to as members of the plan (most notably, access to the supposedly broad network of available providers), and for which they paid premiums. Second, they used out-of-network providers and paid those providers' out-of-network fees for care. Even after the plan reimbursed them the out-of-network allowed amount, these members typically incurred hundreds of dollars in out-of-pocket cost each time they received treatment – a cost far above their expected co-pay amount. Third, they abandoned their search for care, paying a premium for a service they were supposed to receive and did not, and incurring pain and suffering due to the unsuccessful provider search and their inability to receive treatment.

## THIRD CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing

161.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

162.   Plaintiff and Defendant have a direct contractual relationship.

163.   The contract includes an implied covenant, actionable in contract, that Defendant will act in good faith and deal fairly with Plaintiff.

164.   Defendant materially breached the implied covenant in several respects, including but not limited to the following:

    a)   Defendant has failed to make a good-faith effort to maintain an up-to-date network directory;

    b)   Defendant has failed to maintain, and failed to make a good-faith effort to maintain, an adequate network of providers;

    c)   Defendant has presented providers as being in-network that were not, in fact, in-network; and

    d)   Defendant has denied claims and/or failed to pay claims for providers that were listed as in-network in the directory.

165.   Defendant's breaches were conscious and deliberate acts, which were designed to and did unfairly frustrate the agreed common purposes of the contract and which disappointed Plaintiff's and the Class's reasonable expectations by denying Plaintiff and the Class the benefits of the contract.

166.   As a direct and proximate cause of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages including, but not limited to, damages incurred for having to pay for services and claims that should have been covered by the insurance contract.

<strong>FOURTH CAUSE OF ACTION</strong>

<strong>Deceptive acts and practices in violation of the<br/>
New York Deceptive Acts & Practices Act, N.Y. Gen. Bus. Law ("GBL") § 349</strong>

167.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

168.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of GBL § 349.

169.   Defendant violated GBL § 349 by failing to provide Plaintiff and the Class with the accurate information about in-network providers required by federal law, including, but not limited to, the No Surprises Act, Public Health Service Act, Employee Retirement Income Security Act, and Internal Revenue Code.

170.   GBL § 349 imposes liability on anyone who engages in "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in New York.

171.   Plaintiff is a "person" under GBL § 349(h).

172.   Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 349(a).

173.   Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiff and Class members in New York. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

174.   In the course of business, Defendant made deceptive affirmative misrepresentations and omissions to Plaintiff and the Class by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. The provider directory itself, on which members and prospective members are directed to rely, inflates and misleads consumers regarding the breadth of the network and the availability of mental health providers.

175.   False representations include, *inter alia*, that Defendant has an adequately sized network; that providers listed on the provider directory are in-network; that there are sufficient

and available mental health care providers in that network; that members can rely on the directory to find and contact providers with the listed qualifications offering the listed services; and that mental health care coverage is comprehensive.

176.   Omitted and concealed from Defendant's representations were material and relevant facts that Plaintiff and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to be made to find appropriate mental health care.

177.   These representations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that Defendant's provider directory was accurate and broad, and that mental health care would be covered. A reasonable consumer would attach importance to such representations and would be induced to enroll in such a plan.

178.   The misrepresentations and omissions alleged herein were materially misleading.

179.   The acts and practices alleged herein are deceptive acts and practices covered under GBL § 349 and have caused Plaintiff and Class members significant ascertainable monetary and non-monetary injuries. Among other injuries, Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiff and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiff and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiff and Class members to reduce spending on necessities and other life costs; prevented Plaintiff and Class

members from making informed financial and health care decisions; and caused Plaintiff and Class members to suffer severe emotional and psychological distress.

180.  Defendant willfully and knowingly violated GBL § 349. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was in its financial interests to market its plan as comprehensive, including mental health coverage, to induce individuals to choose Defendant's plan over other plans.

## FIFTH CAUSE OF ACTION

### False advertising in violation of the
### New York False Advertising Act, N.Y. Gen. Bus. Law § 350

181.  Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

182.  Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant for violations of the New York False Advertising Act, GBL § 350.

183.  Defendant violated GBL § 350 by failing to provide Plaintiff and the Class with the accurate information about in-network providers required by federal law, including, but not limited to, the No Surprises Act, Public Health Service Act, Employee Retirement Income Security Act, and Internal Revenue Code.

184.  GBL § 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade, or commerce, or in the furnishing of any service in New York. "False advertising" includes "advertising, including labeling of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity . . . ." GBL § 350-a(1).

185.  Defendant's actions as set forth herein occurred in the conduct of business, trade, or commerce under GBL § 350.

186.  Defendant has engaged in consumer-oriented conduct that has misled and harmed Plaintiff and Class members in New York. The actions and practices alleged herein were directed at consumers of health insurance and were therefore consumer-oriented.

187.  A cause of action based upon false advertising is appropriate because Defendant utilized false advertising to mislead Plaintiff and the Class about the nature and coverage of Defendant.

188.  In the course of business, Defendant falsely advertised the Gold Leaf Premier, Essential 200-250, and Essential 1 Plans to Plaintiff and Class members by publishing and disseminating misleading informational and marketing materials prior to and during the open enrollment periods. The provider directory itself, on which members and prospective members are directed to rely, misleads consumers regarding the adequacy and size of Defendant's network and the availability of mental health providers.

189.  False representations include that Defendant has an adequately sized network; that providers listed on the provider directory are in-network; that providers listed as accepting new patients actually accept new patients; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers with the listed qualifications offering the listed services; and that the mental health care coverage is comprehensive.

190.  Omitted and concealed from the representations were material and relevant facts that Plaintiff and Class members would have used in selecting their health insurance plan, including the extent of inaccuracies in the provider directory; the true breadth of the provider

network; the likelihood that a member seeking mental health care would have to obtain

out-of-network treatment, and the costs of such services; and the number of hours and

expenditures that would be needed to be made to find appropriate mental health care.

191.   These representations and omissions, when considered as a whole from the

perspective of a reasonable consumer, conveyed that Defendant's provider directory was

accurate and broad, and that mental health care would be covered. A reasonable consumer would

attach importance to such representations and would be induced to enroll in such a plan.

192.   The false advertising alleged herein was materially misleading.

193.   The acts and practices alleged herein constitute false advertising covered under

GBL § 350 and have caused millions of dollars in damages; forced Plaintiff and Class members

to delay and forgo crucial and necessary mental health care; caused Plaintiff and Class members

significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiff and

Class members to pay inflated premiums for a virtually worthless product; caused Plaintiff and

Class members to reduce spending on necessities and other life costs; prevented Plaintiff and

Class members from making informed financial and health care decisions; and caused Plaintiff

and Class members to suffer severe emotional and psychological distress.

194.   Defendant willfully and knowingly violated GBL § 350. Its effort to include

affirmative misrepresentations and omissions in its marketing materials and provider directory

was in its financial interests to market the Gold Leaf Premier, Essential 200-250, and Essential 1

Plans as comprehensively including mental health coverage to induce individuals to choose its

plan over other plans.

## SIXTH CAUSE OF ACTION

### Violation of New York Insurance Law § 4226

195.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

196.   Insurance companies have a statutory obligation to provide accurate and complete information about their health care plans. Specifically, New York Insurance Law § 4226(a)(1) states in pertinent part: "No insurer authorized to do in this state the business of . . . health insurance . . . shall . . .  issue or circulate, or cause or permit to be issued or circulated on its behalf, any illustration, circular, statement or memorandum misrepresenting the terms, benefits or advantages of any of its policies or contracts."

197.   Defendant is liable under Section 4226 because (1) it is authorized to provide health insurance in New York; (2) it misrepresented to Plaintiff and Class members that they would have comprehensive access to in-network mental health care, including that the mental health providers listed on the provider directory accepted its insurance plan, that these providers would be accessible and available, and more; (3) the misrepresentations were material; (4) Defendant knew that it had misrepresented the terms, benefits, and advantages of its plan and has long been on notice of its provider directory deficiencies; (5) Defendant knew that its online resource, and other documents containing the misrepresentations, would be communicated to Plaintiff and Class members, directly and indirectly; (6) Plaintiff and Class members received such documents and learned of the misrepresentations, directly and indirectly; (7) Defendant did not abide by its representations; and (8) Plaintiff and Class members were thereby injured.

198.   Defendant issued statements via its website, its "Find a Provider" online directory, and other documents that materially misrepresented—through affirmative misstatements as well

as omissions—the comprehensiveness of the Gold Leaf Premier, Essential 200-250, and Essential 1 Plans and mental health care coverage.

199.  These misrepresentations were material because network breadth and access to in-network mental health providers are an important feature of a health insurance plan, which influences health care enrollment decisions.

200.   Plaintiff and Class members have suffered economic and non-economic injuries as a result of Defendant's misconduct. Among other injuries, Defendant's deceptive acts and practices have caused millions of dollars in damages; forced Plaintiff and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiff and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiff and Class members to reduce spending on necessities and other life costs; prevented Plaintiff and Class members from making informed financial and health care decisions; and caused Plaintiff and Class members to suffer severe emotional and psychological distress.

201.  These violations of New York Insurance Law § 4226(a) were intentional and Defendant knowingly received premiums and other compensation as a result of such violations.

**SEVENTH CAUSE OF ACTION**

**Fraudulent Misrepresentation**

202.  Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

203.  Insurance companies have a statutory and common law obligation to provide accurate and complete information about their health care plans.

204.  Defendant made deceptive affirmative misrepresentations and omissions to Plaintiff and Class members by publishing and disseminating misleading informational and

marketing materials prior to and during the open enrollment periods. Defendant's misrepresentations were conveyed in Defendant's online provider directory and other marketing materials. The provider directory itself, on which Plaintiff, as well as other members and prospective members, were directed to rely and did rely, intentionally inflated and misled them regarding the breadth and adequacy of the network and the availability of mental health providers.

205.   The omissions from these same materials include, *inter alia*, any reference to the limited number of mental health providers who are actually in-network with Defendant, accepted Defendant's insurance, and were available to see new patients, and to the fact that members and prospective members have to utilize out-of-network providers—and incur substantial costs— should they need mental health services.

206.   False representations include, *inter alia*, that Defendant has an adequate network of providers; that providers listed on the provider directory are in-network; that providers listed as accepting new patients actually accept new patients; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers with the listed qualifications offering the listed services; and that mental health care coverage is comprehensive.

207.   Omitted and concealed from the representations were material and relevant facts that Plaintiff and Class members would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures that would be needed to find appropriate mental health care.

208.   These misrepresentations and omissions were intended to, and did, induce reliance by Plaintiff and Class members as to the services and benefits that would be delivered to them as a result of choosing Defendant's plan. Plaintiff and Class members chose to enroll in Defendant's plan (instead of better, cheaper options) based on the lies Defendant told about its provider network. And Plaintiff and Class members detrimentally relied on Defendant's inaccurate directory when searching for in-network providers.

209.   Plaintiff and Class members justifiably relied on Defendant's representations and omissions, as Defendant had unique knowledge of the facts underlying their representations.

210.   These fraudulent misrepresentations and omissions, when considered as a whole from the perspective of a reasonable consumer, conveyed that Defendant's provider directory was accurate and broad, and that mental health care would be covered to the full extent that Defendant had represented. A reasonable consumer would—and Plaintiff and Class members did—attach importance to such representations and were induced to enroll in Defendant's health insurance plan as a result.

211.   These fraudulent misrepresentations and omissions alleged herein were intentional and materially misleading. Defendant intentionally led Plaintiff and Class members to believe that its network of available providers was adequate and robust in order to induce them to enroll in, and remain enrolled in, its plan and to prevent them from receiving promised care. Such deception was designed to, and did, allow Defendant to reap enormous financial gain through increased income (by way of premiums paid by Plaintiff and Class members) and reduced costs (by way of delayed, forgone, and unreimbursed care and avoidance of the expenses that would be incurred by creating and maintaining a robust provider network and accurate provider directory).

212.   These fraudulent misrepresentations and omissions have caused Plaintiff and Class members significant ascertainable monetary and non-monetary losses. Among other injuries, Defendant's misrepresentations and omissions have caused millions of dollars in damages; forced Plaintiff and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiff and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiff and Class members to reduce spending on necessities and other life costs; caused Plaintiff and Class members to enroll in Defendant's plan, as opposed to better and/or cheaper plans; prevented Plaintiff and Class members from making informed financial and health care decisions; and caused Plaintiff and Class members to suffer severe emotional and psychological distress.

213.   Defendant willfully and knowingly made the fraudulent misrepresentations and omissions alleged herein. Its effort to include affirmative misrepresentations and omissions in its marketing materials and provider directory was undertaken intentionally to induce individuals to choose its plan over other plans and to prevent them from obtaining covered care, thus increasing its profits.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

214.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

215.   Insurance companies have a statutory and common law duty to provide accurate and complete information about their health care plans.

216.   Nevertheless, Defendant negligently misrepresented its provider network and the availability of mental health providers for members because it failed to provide accurate

information with regard to the breadth, qualifications, availability, identities, and contact information of providers in its network.

217.   After contacting Defendant directly by phone to report his difficulties in locating available, in-network care, Defendant instructed Plaintiff Greene to use the online provider directory to find in-network providers.

218.   Defendant's false representations include, *inter alia*, that it has an adequate network of providers; that providers listed on the provider directory are in-network; that providers listed as accepting new patients actually accept new patients; that there are sufficient and available mental health care providers in that network; that members can rely on the directory to find and contact providers with the listed qualifications offering the listed services; and that mental health care coverage is comprehensive.

219.   Omitted and concealed from Defendant's representations were material and relevant facts that Plaintiff and Class members used, and would have used in selecting their health insurance plan, including, *inter alia*, the extent of inaccuracies in the provider directory; the true breadth of the provider network; the likelihood that a member seeking mental health care would have to obtain out-of-network treatment, and the costs of such services; and the number of hours and expenditures needed to find appropriate mental health care.

220.   Plaintiff and the Class justifiably relied upon the information that Defendant provided. Plaintiff and Class members chose to enroll in Defendant's plan (instead of better, cheaper options) based on the lies Defendant told about its provider network. And Plaintiff and Class members detrimentally relied on Defendant's inaccurate directory when searching for in-network providers.

221.    Defendant has not used reasonable care or competence in providing accurate information about its network of providers and in publishing its provider directory.

222.    As a direct and proximate cause of Defendant's negligent misrepresentations, Plaintiff and Class members have sustained damages. Among other injuries, Defendant's negligent misrepresentations have caused millions of dollars in damages; forced Plaintiff and Class members to delay and forgo crucial and necessary mental health care; caused Plaintiff and Class members to pay inflated premiums for a virtually worthless product; caused Plaintiff and Class members significant out-of-pocket expenses for out-of-network provider payments; caused Plaintiff and Class members to reduce spending on necessities and other life costs; caused Plaintiff and Class members to enroll in Defendant's plan, as opposed to better and/or cheaper plans; prevented Plaintiff and Class members from making informed financial and health care decisions; and caused Plaintiff and Class members to suffer severe emotional and psychological distress.

## NINTH CAUSE OF ACTION

### Unjust Enrichment

223.   Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

224.   Defendant has been and continues to be significantly and unjustly enriched as a result of its inaccurate provider directory and inadequate mental health provider network. Because it portrayed its provider network as comprehensive, Plaintiff and countless other individuals selected Defendant's plan over other plans, paid substantial premiums (or, in the case of Essential Plan enrollees, directed those premiums to be paid by New York State), and did not receive the coverage or care to which they were entitled. As a result, Defendant's market share and profits increased and its costs decreased, thus unjustly enriching it at Plaintiff's and Class

members' expense. Defendant's lies artificially inflated the price of, and induced Plaintiff to enroll in, Defendant's plan, which increased the premiums paid to Defendant.

225.   Plaintiff and Class members have conferred a benefit on Defendant by enrolling in its health insurance plan and thereby directing their medical premiums and capitated rate payments to Defendant.

226.   Plaintiff and Class members have further conferred a benefit on Defendant because Defendant's inaccurate and inadequate network forces Plaintiff and Class members to pay a portion of the mental health care expenses that Defendant represented would be covered. Effectively, Defendant represents that its insurance broadly covers mental health care, including care from providers listed in their directory, yet its bait-and-switch tactics ensure that it does not pay the full costs of actually covering mental health care services.

227.   Defendant has thus enriched itself by reaping the benefits of increased membership, while reducing or eliminating its own coverage, reimbursement, and other financial duties. This and other benefits were obtained at the expense of Plaintiff and Class members, who did not receive the full value of what Defendant promised.

228.   In addition, Defendant's inflated mental health provider network makes it appear that it complies with federal and state statutory and regulatory requirements that its provider network be sufficient, adequate, and accurate, thereby saving it the costs of actual compliance with these requirements—shielding it from government investigation, and the associated costs, at the expense of its members.

229.   An unjust enrichment cause of action is appropriate because Defendant failed to make restitution to Plaintiff and Class members for the economic and non-economic harms, including out-of-pocket costs unjustly incurred, and more.

230.   It is inequitable and unjust for Defendant to retain the benefits from falsely portraying its provider network in a way that increases enrollment while decreasing Defendant's obligations to do exactly what it says it will with respect to providing coverage for mental health treatment.

231.   These expenses and inconveniences should have been borne by Defendant. The profits made by Defendant as a result of its misconduct should be disgorged.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered as follows:

a.      declaring that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying the Class as requested herein, designating Plaintiff as the Class Representative, and appointing the undersigned counsel as Class Counsel;

b.      awarding all injunctive relief permitted by law or equity;

c.      awarding compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity;

d.      awarding statutory damages and penalties in addition to actual damages;

e.      awarding treble damages;

f.      awarding punitive damages in an amount deemed appropriate by the Court;

g.      awarding Plaintiff and the Class pre-judgment and post-judgment interest;

h.      awarding Plaintiff reasonable attorneys' fees and costs; and

i.      awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

* * *

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: October 31, 2025

**POLLOCK COHEN LLP**

By: /s/ *Steve Cohen*
Steve Cohen
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361
Scohen@PollockCohen.com

**WALDEN MACHT HARAN & WILLIAMS LLP**

By: /s/ *Jacob Gardener*
Jacob Gardener
250 Vesey St., 27th Floor
New York, NY 10281
(212) 335-2965
jgardener@wmhwlaw.com

*Attorneys for Plaintiff*